COURT OF APPEALS OF VIRGINIA

Present: Judges Russell, AtLee and Senior Judge Haley

UNPUBLISHED

GERALD RANDOLPH WALL

v.      Record No. 1072-19-3

GILES COUNTY DEPARTMENT
  OF SOCIAL SERVICES

MEMORANDUM OPINION*
PER CURIAM
JANUARY 28, 2020

FROM THE CIRCUIT COURT OF GILES COUNTY
Robert M. D. Turk, Judge

(Mark Q. Anderson, on brief), for appellant. Appellant submitting
on brief.

(Richard L. Chidester, County Attorney; M. Corbin Vierling,
Guardian *ad litem* for the minor children, on brief), for appellee.
Appellee and Guardian *ad litem* submitting on brief.

Gerald Randolph Wall (father) appeals the circuit court orders terminating his parental rights

to his children and approving the foster care goal of adoption. Father argues that the circuit court

erred by terminating his parental rights and finding that the Giles County Department of Social

Services (the Department) "made reasonable efforts to remedy conditions leading to foster care"

because the Department did not offer father "trauma treatment." Father also asserts that the circuit

court erred by approving the foster care goal of adoption because the circuit court erred in

terminating his parental rights. Upon reviewing the record and briefs of the parties, we conclude

that the circuit court did not err. Accordingly, we affirm the decision of the circuit court.

---

* Pursuant to Code § 17.1-413, this opinion is not designated for publication.

BACKGROUND[1]

"On appeal from the termination of parental rights, this Court is required to review the evidence in the light most favorable to the party prevailing in the circuit court." Yafi v. Stafford Dep't of Soc. Servs., 69 Va. App. 539, 550-51 (2018) (quoting Thach v. Arlington Cty. Dep't of Human Servs., 63 Va. App. 157, 168 (2014)).

Father and Angel Lee Parks (mother) are the biological parents to the two children who are the subject of this appeal.[2] The Department removed the two children from their parents' care on November 21, 2017, due to concerns about mother's mental health, father's anger issues, and allegations of physical abuse against the children. The Department had received several complaints of father yelling at and spanking the children "really hard." Father was belligerent and angry when the Department removed the children. He repeatedly threatened the social worker. Father was so threatening to the social worker that law enforcement had to intervene to defuse the situation. Once the children were in the Department's care, the social worker noticed that one of the children had bruises on her arm and that the other child had bruises on her forehead between her eyes. At the time of removal, the children were four years old and almost two years old.

The Department required the parents to work with a parenting coach, participate in counseling, complete anger management and parenting classes, participate in a psychological

---

[1] The record in this case was sealed. Nevertheless, the appeal necessitates unsealing relevant portions of the record to resolve the issues appellant has raised. Evidence and factual findings below that are necessary to address the assignments of error are included in this opinion. Consequently, "[t]o the extent that this opinion mentions facts found in the sealed record, we unseal only those specific facts, finding them relevant to the decision in this case. The remainder of the previously sealed record remains sealed." Levick v. MacDougall, 294 Va. 283, 288 n.1 (2017).

[2] The circuit court also entered orders terminating mother's parental rights under Code § 16.1-283(C)(2) and (E)(i) and approving the foster care goal of adoption. Mother appealed the circuit court's ruling. See Parks v. Giles Cty. Dep't of Soc. Servs., Record No. 1106-19-3.

and parenting capacity evaluation, submit to an attachment assessment, and attend supervised visitations. The parents participated in all of the services, but never made any measurable progress.

Sharon Brammer, a licensed professional counselor and attachment consultant, conducted attachment assessments with the children, mother, and father. Brammer explained that "[a]ttachment is a bond that is form[ed], particularly with the primary caregivers beginning at birth or even before birth, and continues to form, particularly during the first two years." Attachment can affect a child's relationships with peers, teachers, and others, as well as affect their ability "to function in school," "to feel safe," and "to trust the world."

After interviewing father and observing him with the children, Brammer concluded that father did not have "secure attachment patterns" and his "state of mind with regard to attachment was strongly insecure/dismissing" because of an abusive childhood. Mother had reported to Brammer that father spanked the children and used a belt to punish them but was learning new discipline techniques with the parenting coach; Brammer did not witness any inappropriate discipline during her observations.[3] Brammer noticed, however, that father "was uncomfortable with nurturing activities" with the children and "abdicated his parental role" when the children became defiant. Brammer opined that "in addition to his insecure attachment patterns, [father's] significant anger management issues and his family of origin experiences with daily physical abuse limits his ability to interact with [the children] in a[n] appropriate manner." Brammer made several recommendations, including parent coaching and anger management classes, as well as counseling to address his "history of abuse" and "his denial of culpability . . . that led to the [children] being removed." Once father was "psychologically stable," Brammer recommended attachment therapy. Based on Brammer's recommendations, the Department

---

[3] Father denied using a belt to spank the children.

attempted to provide the parents with bonding sessions, but "could not find anyone that would do the bonding sessions based on the results of the evaluation."

Father disagreed with Brammer's opinion that he had not bonded with the children. He testified that he and the children read together, played games, colored and painted, and went to parks. Father, however, admitted to having a closer bond with the younger child.

In addition to seeing Brammer, father met with Dr. Klaire Mundy, a licensed clinical psychologist, who attempted to conduct a psychological and parenting capacity evaluation on father. On the day of the evaluation, father arrived on time for the appointment, and mother accompanied him. Mother, however, became "very hostile, belligerent, angry, [and] agitated." Mother screamed and cursed at Dr. Mundy, and at one point, Dr. Mundy was "quite concerned" about mother becoming physically violent. Father tried to calm mother down and encouraged her to leave the office.[4] Dr. Mundy advised the Department that father "had to forcefully put his hands on [mother] and remove[d] her from the waiting room."

Although father completed all of the tests, Dr. Mundy did not produce an evaluation for father because she could not generate an unbiased professional report because of mother's behaviors and father's interactions with mother. Dr. Mundy testified that father displayed "a lot of agitation, aggravation, feelings of being blamed and kind of persecuted." He "went on about conspiracy theory." Dr. Mundy was alarmed that father thought that mother did not have any problems and that "he could handle her," because "that was absolutely demonstrated to be not true." Dr. Mundy also expressed "extreme concerns" about "what happen[ed] behind closed doors at home" when the parents were "so aggressive and so threatening" and "unable to maintain themselves in a professional setting."

---

[4] Mother testified that she was asleep in the truck during father's appointment.

In addition to referring the parents for evaluations, the Department offered them supervised weekly visitations. The Department expanded the visits to four-hour community visits, but the parents never progressed to overnight visits. The parents struggled to manage the children's behaviors when the visits were longer. The social worker described the visits as "very chaotic" and noticed that the children interacted more with her, the visitation supervisor, and the parenting coach than the parents.

After each visit, the parenting coach met with the parents to discuss what she observed and how they could improve. Father was receptive to the suggestions and tried to implement them; however, father habitually smacked mother or the children to get their attention, even after he completed anger management classes.[5] The parenting coach noticed that when father was frustrated, he became "unnecessarily firm and aggressive" with the children. His actions, however, "seldom accomplished" anything, as the children continued to do what they wanted to do. Father testified that he would "find ways" to stop spanking the children, such as redirecting them, if they were returned to his care. During visitations, however, father was unable to demonstrate consistently that he knew how to redirect the children when they were upset.

In October 2018, the Department filed petitions to terminate mother's and father's parental rights and change the foster care goal to adoption. On January 30, 2019, the Giles County Juvenile and Domestic Relations District Court (the JDR court) terminated mother's and father's parental rights and approved the foster care goal of adoption. The parents appealed the JDR court rulings.

The parties appeared before the circuit court on March 22 and June 7, 2019. The Department conceded that there were no issues with the parents' ability to provide shelter, food,

---

[5] The parenting coach did not view father's actions as domestic violence.

and clothing.  The Department argued that the issue was whether the parents had made any progress toward addressing the issues that caused the children to come into foster care.

The Department presented evidence about the children's welfare.  The parents' visitations with the children stopped once the JDR court terminated their parental rights; thereafter, the children's behaviors and physical health improved.  Both children stopped throwing tantrums.  They became more talkative and outgoing.  The social worker described the children as "completely different" and happier.  When the children entered foster care, both were "substantially overweight," but at the time of the circuit court hearing, neither child was overweight.  The parenting coach noted that the parents did not teach the children "the most basic level social skills," such as saying "please" and "thank you," but they learned these skills and more, such as how to take responsibility for their actions, in foster care.

The social worker and parenting coach testified that they had provided all available services to no avail and that no other services were available to assist mother and father.  The parenting coach found that the parents "have a lot of struggles with communication and they are not able to provide the emotional support" or the stability that children need.  The parents did not make any measurable progress during the twenty-five months that the Department provided them with services.

Father testified that he did not want the court to terminate his parental rights.  Father blamed the Department for taking his children and thought that many of the Department's witnesses did not testify truthfully.  On cross-examination, father admitted to being a convicted felon.

After hearing all of the evidence and arguments, the circuit court found that it was in the best interests of the children to terminate father's parental rights.  On June 7, 2019, the circuit

court entered orders terminating father's parental rights under Code § 16.1-283(C)(2) and approving the foster care goal of adoption. This appeal followed.

ANALYSIS

Father argues that the circuit court erred by terminating his parental rights under Code § 16.1-283(C)(2), which provides that a court may terminate parental rights if:

> The parent or parents, without good cause, have been unwilling or unable within a reasonable period of time not to exceed 12 months from the date the child was placed in foster care to remedy substantially the conditions which led to or required continuation of the child's foster care placement, notwithstanding the reasonable and appropriate efforts of social, medical, mental health or other rehabilitative agencies to such end.

"On review, '[a] trial court is presumed to have thoroughly weighed all the evidence, considered the statutory requirements, and made its determination based on the child's best interests.'" Castillo v. Loudoun Cty. Dep't of Family Servs., 68 Va. App. 547, 558 (2018) (quoting Logan v. Fairfax Cty. Dep't of Human Dev., 13 Va. App. 123, 128 (1991)). "Where, as here, the court hears the evidence *ore tenus*, its finding is entitled to great weight and will not be disturbed on appeal unless plainly wrong or without evidence to support it." Fauquier Cty. Dep't of Soc. Servs. v. Ridgeway, 59 Va. App. 185, 190 (2011) (quoting Martin v. Pittsylvania Cty. Dep't of Soc. Servs., 3 Va. App. 15, 20 (1986)).

Father argues that "reasonable and appropriate efforts were not made to assist him in remedying the conditions that led to his children's [placement in foster] care." He asserts that Brammer recommended counseling, specifically "trauma treatment" to address his abusive childhood, before he could engage in attachment therapy. Father emphasizes that the Department could not confirm that father was provided trauma treatment. The Department indicated, however, that it referred father to counseling, and it simply did not know whether father had addressed his childhood trauma with the counselor.

- 7 -

The circuit court found that the Department offered "reasonable services" to the parents. "'Reasonable and appropriate' efforts can only be judged with reference to the circumstances of a particular case. Thus, a court must determine what constitutes reasonable and appropriate efforts given the facts before the court." Harrison v. Tazewell Cty. Dep't of Soc. Servs., 42 Va. App. 149, 163 (2004) (quoting Ferguson v. Stafford Cty. Dep't of Soc. Servs., 14 Va. App. 333, 338 (1992)). The Department provided evidence that it had provided all available services to father and that no other services were available. Father never progressed or accepted responsibility for his actions, despite the counseling, parenting sessions, and anger management classes to which the Department referred him. The circuit court was concerned that father's anger management and attachment issues had never been resolved throughout the entire process. The evidence supported the circuit court's finding that the Department had provided reasonable services to the parents.

Furthermore, the circuit court noted that the children already had been in foster care for "almost two years . . . with services being provided and . . . we're still in the same spot we were when we began." The circuit court emphasized its "obligation to stop and to put some permanency and stability in [the children's] lives." "It is clearly not in the best interests of a child to spend a lengthy period of time waiting to find out when, or even if, a parent will be capable of resuming his [or her] responsibilities." Tackett v. Arlington Cty. Dep't of Human Servs., 62 Va. App. 296, 322 (2013) (quoting Kaywood v. Halifax Cty. Dep't of Soc. Servs., 10 Va. App. 535, 540 (1990)). Contrary to father's arguments, the circuit court did not err in terminating his parental rights under Code § 16.1-283(C)(2) and finding that the Department had provided reasonable services.

With respect to father's challenge of the foster care goal of adoption, "[o]ur decision to affirm the termination order necessarily subsumes this aspect of his appeal because a

preponderance-of-the-evidence standard governs judicial modifications of foster care plans."

Toms v. Hanover Dep't of Soc. Servs., 46 Va. App. 257, 265 n.3 (2005).

## CONCLUSION

For the foregoing reasons, the circuit court's ruling is affirmed.

<u>Affirmed.</u>